## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

RICHARD F. FLAMMIA,

               Plaintiff,

v.

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

Civil Action No. 15-cv-13537-RGS

---

**REPORT AND RECOMMENDATION ON PLAINTIFF RICHARD FLAMMIA'S
MOTION FOR JUDGMENT ON THE PLEADINGS;
AND ON DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION
OF THE ALJ
(Dkt. Nos. 10, 13)**

CABELL, U.S.M.J.:

      Plaintiff Richard Flammia ("Flammia" or "the plaintiff") moves to reverse or remand a final decision by the Commissioner of Social Security ("the Commissioner") denying his application for Disability Insurance Benefits ("DIB").  The Commissioner cross-moves to affirm its decision.  (Dkt. Nos. 10, 13).  As discussed below, I recommend that the Commissioner's motion to affirm be granted and that the motion for judgment on the pleadings seeking to reverse the Commissioner's decision be denied.

## I.     PROCEDURAL HISTORY

      On June 7, 2013, the Plaintiff filed an application for DIB under Title II of the Social Security Act.  (Dkt. No. 7; *Social Security Administration Record of Social Security Proceedings*, at page 226 [hereinafter "(R. __)"].  The plaintiff suffers from anxiety and irritable bowel syndrome ("IBS") and claims that he has been disabled since December 17, 2012.  (R. 225).

On October 15, 2013, the Social Security Administration ("SSA") determined that the plaintiff was not disabled during the relevant period and therefore was not entitled to DIB. (R. 158). On January 31, 2014, the SSA affirmed its determination after reconsideration. (R. 161).

The plaintiff requested an administrative hearing and received one before Administrative Law Judge Paul W. Goodale ("the ALJ"), on January 22, 2015. (R. 64 - 128). On April 9, 2015, the ALJ determined in a written decision that the plaintiff was not disabled, and was therefore ineligible for DIB. (R. 42-56). On August 11, 2015, the Appeals Council denied the plaintiff's request for a review of the ALJ's decision, making it the final decision of the Commissioner. (R. 1-4).

The plaintiff then filed this action on October 9, 2015.

## II.   FACTS

### a.   Personal and Employment History

The plaintiff was born on April 27, 1964, and was 48 years old at the time of the alleged onset of his disability in 2012. (R. 224). He is a high school graduate and has completed some college level coursework. (R. 48). The plaintiff's past relevant work includes positions as a bank operations manager, a mailroom clerk, a shipping/receiving clerk, and a liquor store manager. (R. 54).

### b.   The Treating Physicians' Opinions

The plaintiff has seen two physicians for treatment for his conditions, including Dr. Daniel Trutt and Dr. Bennet Tittler. Both agree that the plaintiff suffers from IBS and anxiety. (R. 395, 417, 470).

Dr. Trutt, the plaintiff's primary care physician, began seeing him in 2012. Dr. Trutt noted that the plaintiff had been taking "benzos" medication for his anxiety since the age of 23. In

addition to that medication Dr. Trutt prescribed the plaintiff valium for his anxiety, and Flexeril, Tramadol, and Bentyl for his IBS.  (R. 389, 390, 394).  In December 2012 Dr. Trutt increased the plaintiff's valium dose to up to six times a day to address increased stress and anxiety the plaintiff was experiencing from being laid off from his job.  (R. 384).

As of April 2013 Dr. Trutt continued to prescribe the plaintiff the increased 6X a day dosage of valium to treat his anxiety, but made no changes to the plaintiff's medication for IBS. (R. 382).  Even so, though, the plaintiff stated that he felt completely overwhelmed and unable to work.  (R. 381).

 In May 2013 the plaintiff began seeing Dr. Tittler for psychological treatment.  In June 2013 he told Dr. Tittler that he had acute anxiety trending towards agoraphobia because he did not want to stray too far from a bathroom in light of his IBS. (R. 411).

In August 2013 Dr. Trutt noted that the increased valium dosage was helping the plaintiff, although the plaintiff's anxiety still prevented him from sustaining employment.  (R. 435).  Dr. Trutt also noted that the plaintiff got along fine with other people and could travel independently outside.  Dr. Trutt saw no evidence of memory, concentration, or attention deficits.  *Id.*

In September 2013 Dr. Tittler diagnosed the plaintiff with generalized anxiety disorder and major depressive disorder in the context of chronic IBS.  (R. 403).  Dr. Tittler also assessed a Global Assessment of Functioning ("GAF") of 52, which was indicative of moderate psychiatric symptoms and limitations in social, occupational, or school functioning.  *Id*.  Dr. Tittler additionally concluded that the plaintiff had a number of marked limitations in several areas.  Dr. Tittler determined the plaintiff's prognosis to be poor and encouraged him to pursue a disability determination.  (R. 413).

In October 2013 Dr. Trutt considered the plaintiff's prognosis for anxiety to be guarded

but opined that his anxiety symptoms would increase in a competitive work environment.  He did not change the plaintiff's valium dosage.  (R. 433).

In April 2014 the plaintiff reported to Dr. Trutt that he'd run out of valium prior to the visit, and had experienced increased anxiety which had in turn exacerbated his IBS symptoms.  (R. 463). Dr. Trutt continued to prescribe a dosage of valium of up to six times a day.  (R. 464).

In August 2014 the plaintiff reported to Dr. Trutt that his anxiety was stable but that his IBS symptoms made it difficult to leave the house.  (R. 460).  Dr. Trutt noted as much and left the dosage unchanged.  (R. 462).

In October 2014 the plaintiff met with Dr. Tittler and reported some increased anxiety due to the holidays and his upcoming disability appeal hearing.  (R. 454).  Dr. Trutt subsequently recommended regular aerobic exercise but no change in medication. (R. 455).

In December 2014 Dr. Tittler reassessed the plaintiff's GAF score to be a 54, indicating the plaintiff had moderate anxiety symptoms and mental functional limitations.  (R. 470).  Dr. Tittler opined that the plaintiff had marked functional limitations in his ability to maintain attention and concentration for extended periods, to perform actives within a schedule and be punctual, to complete a workday without interruptions from psychological symptoms, to perform at a consistent pace without rest, and to set realistic goals.  (R. 473).

c.  State Agency Opinions

Following the plaintiff's submission of his application for disability benefits, the SSA asked Dr. John Burke, a Disability Determination Services consultant, to review the plaintiff's medical records, which he did in September 2013.  (R. 130-140).  Dr. Burke found that the plaintiff had mild limitations regarding his daily activities, no social functioning limitations, moderate limitations in maintaining concentration, persistence or pace, and had no episodes of

decompensation of extended duration. *Id.* Dr. Burke also opined that the plaintiff could focus and adapt to simple, repetitive tasks with rest periods at 3 hour intervals, and could also adapt to simple tasks and changes. *Id.* He also agreed with Dr. Trutt's findings that the plaintiff could travel in public, get along with others despite anxiety and agoraphobia, and had no memory or attention deficits. *Id.* Dr. Burke further opined that the plaintiff could work at his previous jobs. The SSA subsequently determined that the plaintiff was not disabled. *Id.*

The plaintiff asked for a reconsideration of the denial of his application and the SSA asked Dr. Menachem Kasdan, another Disability Determination Services Consultant, to review the plaintiff's medical records in connection with that process. He did so in December 2013. (R. 142-154). Dr. Kasdan opined that the plaintiff had mild limitations in daily activities and social functioning, moderate limitations in maintaining concentration, persistence, or pace, and had no episodes of decompensation of extended duration. *Id.* Dr. Kasdan also found that the plaintiff could understand, remember, carry out simple tasks, and maintain adequate concentration and pace on those tasks for 2 hour intervals. *Id.* However, he felt that the plaintiff would likely have some trouble dealing with increased stress and pressures, but could adapt to simple, routine changes. *Id.* The SSA affirmed its initial finding that the plaintiff was not disabled. *Id.*

### d.   The Administrative Hearing Before the ALJ

On January 22, 2015 an ALJ convened an administrative hearing at the plaintiff's request. (R. 64). The plaintiff testified at the hearing. Among other things he testified that he had completed high school, could read and write in English, had basic computer skills, managed his own bills, and could make basic changes. He also testified that he did not ride public transportation as a result of his anxieties, but had a driver's license and had access to a car to drive for errands and appointments. (R. 70-73). The plaintiff also recounted some of his work history and testified

about leaving some jobs due to stress induced IBS symptoms, and going on short term disability. (R. 76-85).

The plaintiff also testified about his IBS and anxiety symptoms in the course of a typical day.  He testified that he needed frequent bathroom breaks up to twelve times a day, felt severe sharp abdominal and intestinal pain and pressure, had blood in his stool, and would wake up with terrible stomach pain despite making changes to his diet.  (R. 85-89).  He stated that he slept only two to four hours per night and often needed three to six 15-45 minute naps per day.  (R. 86-105).

The plaintiff did state that he could perform some daily living activities despite his alleged symptoms.  (R. 93-97).  Specifically, he indicated that he was able to perform personal care tasks independently, prepare meals, do the dishes and laundry, and clean the house in short intervals. However, he did not perform yard work and would often need to rest between these activities.  *Id*. He also testified that he socialized with his son and daughter, cared for two cats, talked to neighbors, watched TV, and did not drink or use drugs.  (R. 97-99).

A vocational expert testified at the hearing regarding the types of work a person with similar limitations could perform.  (R. 110-122).  The vocational expert considered the plaintiff's residual functional capacity ("RFC"), his age, education, and work experience, and testified that someone in that position could perform the work of a janitor, a price ticket marker, or a photocopy machine operator.  *Id*.  The vocational expert further testified that there were 53,000, 46,740, and 1,780 jobs respectively for those positions available in the local Massachusetts economy.  *Id*.

e.  The ALJ's Findings

On April 9, 2015, the ALJ found that the plaintiff was not disabled.  (R. 56).  The ALJ noted that in order to be eligible for DIB, the plaintiff must be unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ applied a five-step evaluation to determine that the plaintiff did not meet this standard.

Step one considers whether or not the plaintiff is engaging in substantial gainful activity ("SGA"), because a claimant who is so engaged is not disabled. 20 CFR § 404.152(b). SGA is defined as work activity done for pay that involves doing significant physical or mental activity. 20 CFR §§ 404.1572(a), (b). The ALJ found that the plaintiff had not engaged in SGA since the alleged onset date of his disability, December 17, 2012. (R. 44).

Step two considers whether or not the plaintiff's impairment(s) is severe as defined by the pertinent regulations. 20 CFR § 404.1520(c). The ALJ found that the plaintiff had several severe impairments, including anxiety disorder with panic attacks, affective disorder, irritable bowel syndrome, and gastroenteritis. (R. 45). The ALJ reached this conclusion after determining that the impairments or combination of impairments created more than a minimal functional limitation in the plaintiff's ability to perform basic work activities and were, therefore, severe impairments. *Id*.

Steps three, four and five operate in tandem. Step three requires the ALJ to consider whether or not the plaintiff's impairments taken together are severe enough to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. 20 CFR §§ 404.1520(d), 404.1526. If so, the claimant is conclusively presumed to be disabled. If not, one moves to step four, which considers whether the applicant's RFC allows him to perform his past relevant work. If the claimant is capable of performing past relevant work, he is not disabled. If the claimant's RFC in step four does not allow him to perform his past relevant work, the burden shifts to the Commissioner in step five to prove that the claimant is still "able to perform other

work in the national economy in view of [the claimant's] age, education, and work experience."

20 C.F.R. §§ 404.1520(a)(4)(iii-v).

Here, the ALJ found at step three that the plaintiff's impairments did not meet or medically

equal the severity criteria of an impairment listed in the pertinent regulations.  The ALJ thus

continued to step four and found that the plaintiff had the RFC to perform some work, albeit with

some limitations:

> After careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform a full range of work at all exertional levels,
> but with the following nonexertional limitations: he could never climb ropes,
> ladders or scaffolds; and he should avoid working in confined areas, such as very
> small or windowless rooms, or in [a] closet, booth or storage room areas, but he
> could work in warehouses.  The claimant could not perform production rate or pace
> work, and must work in a low-stress work environment with only occasional
> decision-making and occasional changes in work setting.  The clamant could have
> occasional interaction with the general public, but would need to work in close
> proximity to a restroom.  (R. 47).

In reaching this finding, the ALJ considered the plaintiff's symptoms and found that,

while the plaintiff's medically determinable impairments could reasonably be expected to cause

the alleged symptoms, the plaintiff's statements regarding intensity, persistence, and the limiting

effects of their symptoms were not entirely credible.  The ALJ noted that in order for an

individual to be found disabled based on complaints of pain or other symptoms, the evidence

must establish the existence of an impairment expected to result in the symptoms alleged.  In

looking at the evidence as a whole, the ALJ found that it was insufficient to establish the existence

of an impairment that accounted for the degree of the symptoms the plaintiff claimed to have.

(R. 52-53).

In terms of the plaintiff's alleged anxiety and affective disorders, the ALJ found that

objective evidence supported diagnoses for generalized anxiety disorder and moderate major

depressive disorder in the context of his medical condition of irritable bowel syndrome (IBS),

but he did not believe that the plaintiff was precluded from all gainful work activity due to the combination of his impairments.  Rather, the ALJ noted that the treating primary care and mental health therapy treatment notes supported moderate psychiatric symptoms and mental functional limitations (GAF 52-54), and Dr. Trutt opined that the claimant's anxiety symptoms were stable with medication compliance.  The ALJ also noted that the plaintiff was not followed by a psychiatrist and had not had any inpatient psychiatric admissions or day treatment programs.  And although Dr. Tittler as his psychotherapist had opined that the plaintiff needed a regular source of income to relieve his financial stress and to allow him to focus on improving his mental functioning, objective treatment records showed normal mental status exams without evidence of psychosis.  The treatment records showed some impaired immediate memory and concentration due to IBS pain and anxiety, but also showed he engaged in some independent daily activities, and had good relationships with his paternal uncle, two adult children, roommate, neighbors, and treatment providers.  From all of this, the ALJ found that the marked functional limitations opined by Drs. Trutt and Tittler were not supported by those providers' own objective clinical findings during office visits, or by the plaintiff's hearing testimony and demeanor at the hearing.  Rather, the ALJ agreed with the opinions of the two state agency consultants, Drs. Burke and Kasdan, that the plaintiff was capable of understanding, remembering and carrying out simple instructions and adapting to simple changes, despite evidence of distractibility and a low stress tolerance due to anxiety and IBS.  The ALJ found, however, that the plaintiff should have only occasional interaction with the public due to social anxiety and some agoraphobia.  (R. 53).

With respect to the psychological opinion evidence, the ALJ gave substantial weight to the two state agency mental functional assessments and their findings that the plaintiff could still understand, remember and carry out simple tasks and adapt to simple changes in the workplace,

because these opinions were supported by the overall record.  However, the ALJ found that the plaintiff's social anxiety with agoraphobia supported additional environmental limitations (*i.e.,* no confined spaces), and limited him to only occasional interaction with the general public.  (R. 53).

In contrast, the ALJ gave less weight to Drs. Trutt and Tittler to the extent they opined that the plaintiff had marked mental functional limitations and an inability to sustain competitive work. The ALJ found that the objective record did not support such a finding, for three reasons.  First, the ALJ noted that, notwithstanding the two doctors' opinions that the plaintiff was disabled, disability is an issue reserved to the Commissioner, per SSA regulations.  Second, both the primary care physician and psychotherapy notes showed that the plaintiff had improved, stable anxiety symptoms with medication compliance, and only moderate symptoms and mental limitations, findings which the ALJ found to be inconsistent with the marked mental functional opinions.  The ALJ noted that a GAF is not conclusive of an ability to work but it does show the claimant's functioning at a moment in time, and the GAF scores for the plaintiff supported the state agency findings for moderate disorder, simple tasks and simple changes.  Third, the ALJ noted that the plaintiff testified to performing independent daily activities and to having solid interpersonal relationships with family, friends, neighbors and treatment providers.  Taking all of these factors together, the ALJ found that the psychological opinion evidence taken as a whole supported a finding of only mild to moderate psychiatric symptoms exacerbated by IBS symptoms, and vice versa.  (R. 53-54).

As for the physical opinion evidence, the ALJ noted a general dearth of reliable evidence in the record.  He found that there appeared to be no treating or evaluating source physical assessments in the record.  He acknowledged the two state agency physical assessments that opined

the claimant's IBS was a non-severe impairment, but in fact gave *less* weight to those opinions.

On the contrary, the ALJ found that in light of the claimant's need for frequent bathroom breaks,

his allegations of muscle spasm, cramping and pain flares due to IBS, and his conservative

treatment with Bentyl, the plaintiff's IBS caused more than minimal functional limitations in his

ability to perform basic work activities.  The ALJ concluded that the plaintiff's IBS was, therefore,

a severe medical impairment.

     Having reached that conclusion, however, the ALJ did not agree that the plaintiff was

precluded from all work activity, particularly in view of evidence that he was able to perform

independent daily activities, to sit and watch TV, to drive a car, and to take walks for exercise. The

ALJ found that the plaintiff could, in the workplace, manage the symptoms and physical

limitations imposed by his IBS medical condition if he were to find a low stress-work environment

to avoid IBS exacerbations, together with proximity to a bathroom for restroom breaks.  (R. 54).

     The ALJ concluded that his residual functional capacity assessment of the plaintiff was

supported by the overall evidence of record, including objective imaging, laboratory testing,

mental health and primary care treatment notes, two state agency mental functional assessments,

the plaintiff's statements to treating sources and at the ALJ hearing, and his Adult Function Report.

     Still, though, the ALJ found that the limitations to the plaintiff's residual functional

capacity left him unable to do his past relevant work as a bank operations manager, a mailroom

clerk, a shipping/receiving clerk, or a liquor store manager.  (R. 54).

     Accordingly, the ALJ moved on to step five, to consider whether the plaintiff was capable

of performing any other work given his RFC, age, education and work experience.  (R. 54).  The

ALJ found based on such factors that the plaintiff could perform other jobs that exist in significant

numbers in the national economy, such as a janitor, price ticket marker, or photocopy machine

operator.  (R. 54-55).  The ALJ determined that the plaintiff therefore was not disabled because he was capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  (R. 55).

On August 11, 2015, the Appeals Council found no reason to review the ALJ's decision and denied the plaintiff's request for a review.  (R. 1-7).

## III.   DISCUSSION

The plaintiff argues that the ALJ committed two reversible errors.  He argues that the ALJ improperly weighed the medical opinions of the two treating physicians Dr. Trutt and Dr. Tittler. He argues also that the ALJ erred in assessing his credibility.  The Commissioner argues that the ALJ's decision should be affirmed because substantial evidence supports the decision to give lesser weight to the treating physicians and to discount the plaintiff's credibility regarding the intensity, persistence, and limiting effects of his symptoms.

### a.   Standard of Review

A Court reviews the findings of an ALJ only to determine whether the findings are supported by substantial evidence, and whether the correct legal standard was applied.  *Teague v. Colvin*, 151 F. Supp. 3d 1, 2 (D. Mass. 2015).  Substantial evidence to support a decision exists if "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Id.*  This Court must keep in mind when applying this standard of review that it is the role of the ALJ, and not this Court, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence.  *Ortiz v. Secretary of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).  This Court may affirm, modify, or reverse the ALJ's decision, but reversal is only warranted if the ALJ made a legal or factual error in evaluating the plaintiff's claim, or if the record contains no "evidence rationally adequate…to

justify the conclusion" of the ALJ.  *Roman–Roman v. Commissioner of Soc. Sec.*, 114 Fed.Appx. 410, 411 (1st Cir. 2004).  This Court therefore must affirm the ALJ's decision if it is supported by substantial weight, *even if the record could arguably support a different conclusion.  Evangelista v. Secretary of Health and Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987) (emphasis added).

> b.  Analysis

> The ALJ did not Improperly Weigh the Medical Opinion Evidence

The plaintiff argues that the ALJ misapplied the correct legal standard and improperly weighed the medical opinions of Drs. Trutt and Tittler (the treating physicians) and Drs. Kasdan and Burke (the agency physicians) in determining his RFC at step four.  The plaintiff argues that the ALJ should have given more weight to the opinion of his treating physicians, who opined that he was disabled.  The plaintiff also argues that the ALJ failed as required to give good reasons as to why he gave less weight to the treating physicians.

An ALJ must "always consider the medical opinions in [the] case record." 20 C.F.R §§ 404.1527(b); 416.927(b).  The ALJ must also give controlling weight to a treating physician's opinion on nature and severity of the impairments if they are (1) well supported by medically acceptable clinical and laboratory diagnostic techniques and (2) are not inconsistent with other substantial evidence in the record.  20 C.F.R § 404.1627(c).  In certain circumstances, however, the ALJ does not have to give a treating physician's opinion controlling weight.  *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991) (observing that "[t]he law in this circuit does not [always] require ALJs to give greater weight to the opinions of treating physicians").  Indeed, the regulations allow the ALJ to discount the weight given to a treating source opinion where it is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians.  *Arruda v. Barnhart*, 314 F. Supp. 2d

52, 72 (D. Mass. 2004); 20 C.F.R. §§ 404.1527(c)(2)-(4).  Where controlling weight is not given

to a treating source opinion, the ALJ must consider several factors in determining the weight

granted to an opinion, including the length of treatment relationship and frequency of examination,

the nature and extent of the treatment relationship, and the consistency of the opinion with the

record as a whole. 20 C.F.R §§ 404.1527(c)(2)-(6).

Applying these principles here, the Court cannot say that the ALJ erred in according greater

weight to the medical opinions of Drs. Kasdan and Burke.  The ALJ may give greater weight to

the medical opinions of non-treating physicians so long as there is good reason to do so. *Bourinot*

*v. Colvin*, 95 F. Supp. 3d 161, 175 (D. Mass. 2015).  In the present case, the ALJ did consider the

medical opinions of the treating physicians but found that the opinions of those doctors were

inconsistent with other substantial evidence in the record.  In particular, the ALJ found their

opinions to be inconsistent with the overall record based on the plaintiff's GAF scores, his normal

mental status exams, his stability on medication, and his ability to maintain relationships.  The

ALJ also noted that most of the treating physician's notes consisted of their simply reciting the

plaintiff's own statements regarding his symptoms, as opposed to clinical testing.

Notwithstanding these explanations, the plaintiff argues that the ALJ "failed to give good

reasons" for accepting the agency doctors' opinions over the treating physicians' opinions.  In light

of the fact that the ALJ clearly *did* give reasons for how he weighed the respective opinions before

him, the Court assumes the plaintiff's argument is that the ALJ did not give *good* reasons for doing

so.  The Court does not agree.  First, the ALJ did not, as the plaintiff appears to argue, summarily

reject or discount the import of the treating physician's opinions because they opined on the

ultimate issue of whether the plaintiff was disabled.  It is true that the ALJ remarked that disability

is a determination left to the Commissioner, but there is no evidence that the ALJ as a result failed

to consider the doctors' opinions "in conjunction with the underlying clinical support for the opinion." *See Rodriguez v. Sec. of HHS,* 647 F.2d 218, 223 n. 9 (1st Cir. 1981).  On the contrary, the ALJ made it plain that he gave less weight to the doctors' opinions because they were inconsistent with the objective record as evidenced by Dr. Tittler's own notes regarding the plaintiff's improved and stable state, as well as the plaintiff's own testimony that he was capable of performing independent daily activities and to having solid interpersonal relationships.  Given that this evidence came from a treating source itself, the Court cannot say that it was error for the ALJ to consider its relevance along with the rest of the evidence.

To be sure, the plaintiff argues that Drs. Trutt and Tittler provided objective support for their opinions.  He contends that Dr. Tittler's opinions were based on psychiatric interviews and a review of treatment records that documented several concerning traits, including among other things poor memory, appetite, sleep and mood disturbance, aloofness, anxiety, irritability and low energy.  He argues that Dr. Trutt similarly reported evidence of anxiety, poor concentration, distractibility, and chronic insomnia.  The plaintiff argues that the ALJ did not identify any other evidence in the record contradicting his physicians' opinions.

But, the record shows that the ALJ was conscious of these findings and did in fact consider them.  Indeed, the ALJ credited Dr. Tittler's findings and found "after careful consideration of the evidence" that the plaintiff's impairments "could reasonably be expected to cause the alleged symptoms…"  (R. 52).  However, the ALJ balanced these notes with other conflicting evidence, including the treating physicians' own records indicating that the plaintiff had no more than moderated limitations given his normal mental status exam, moderate rather than severe GAF scores, and required little more than medication management for the plaintiff's anxiety, which had moreover noted improvement and stability on medication.  The ALJ reasonably found, in the

Court's view, that while the record did indeed demonstrate that the plaintiff suffered from severe impairments, "the evidence as a whole," including the plaintiff's "not entirely credible" testimony, did not establish "the existence of an impairment that accounts for the *degree* of the symptoms alleged." (R. 52-53) (emphasis original). Accordingly, the record demonstrates that the ALJ did consider the treating sources' opinions, but had good reasons for weighing them as he did. In that regard, the issue is not whether the ALJ (or this Court) might have concluded differently, but whether the record supports the finding the ALJ reached. *Evangelista*, 826 F.2d at 144. As discussed above, it does.

In sum, the ALJ had a reasonable basis to weigh the treating physicians' opinions as he did and did not err in according less weight to the treating physicians' medical opinions.

<u>The ALJ Properly Evaluated the Plaintiff's Credibility</u>

The plaintiff asserts that the ALJ erred in evaluating his credibility with respect to the plaintiff's testimony regarding the intensity, persistence, or functionally limiting effects of pain or other symptoms. The plaintiff's argument on this point essentially tracks his argument regarding the weight the ALJ chose to give to the physicians' medical opinions. Distilled, he argues that the evidence in the record was not inconsistent with the plaintiff's testimony regarding the overall extent and intensity of his symptoms. That misstates the relevant inquiry for this Court, however. The issue is not whether the ALJ could have alternatively chosen to fully credit the plaintiff's testimony, but whether the record supports the finding the ALJ did make. In this case, and as discussed above, the record shows there was ample evidence suggesting the plaintiff was not suffering to a degree warranting a finding of disability. Among other things, the plaintiff acknowledged that he had access to a car and was able to drive, he was able to perform personal care tasks independently, to prepare meals, do dishes and laundry, clean the house in short

intervals, periodically socialize with his son and daughter, and walk for exercise. The ALJ also weighed the plaintiff's testimony against objective medical evidence in the record tending to show that the degree of the intensity, persistence, and limiting effects of the alleged symptoms as described by the plaintiff were just not supported. There is no basis to find that the ALJ erred in doing so.

Accordingly, the Court finds that the ALJ fulfilled his obligation to consider the evidence as a whole and to place each piece of evidence in perspective in light of the remainder of the evidence. In that regard, the ALJ was not required to take the plaintiff's allegations at "face value." *Bianchi v. Sec'y of Health & Human Servs.*, 764 F.2d 44, 45 (1st Cir. 1985). The ALJ was in the best position to assess the plaintiff's credibility and this Court finds no basis to second guess that assessment where it appears the ALJ carefully parsed the record in an effort to credit all of the portions of the plaintiff's testimony supported by or consistent with other evidence in the record. *See Ortiz v. Secretary of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (noting that it is the role of the ALJ and not the court to determine issues of credibility).

## IV. <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully recommended that the motion to affirm the Commissioner (Dkt. No. 13) be GRANTED and the plaintiff's motion for judgment on the pleadings, or to reverse the Commissioner (Dkt. No. 10) be DENIED. The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the bases for such objections. The parties are further advised

that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b), will preclude further appellate review of the District Court's order based on this Report and Recommendation.  *See Keating v. Secretary of health and Human Services,* 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678, F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also, Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466 (1985).

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED: August 8, 2016